**Opinion issued January 31, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-11-00665-CV

————————————————

**CSL PROPERTY MANAGEMENT CO. AND GREATLAND INVESTMENTS, INC., Appellants**

**V.**

**THYSSENKRUPP ELEVATOR COMPANY, Appellee**

---

**On Appeal from the 11th District Court
Harris County, Texas
Trial Court Case No. 2009-75846**

---

**MEMORANDUM OPINION**

This is a dispute between an elevator contractor and the manager and owner of a building over the work performed and payments owed under the parties' contracts. CSL Property Management Co. and Greatland Investments, Inc. appeal

from the trial court's summary judgment in favor of ThyssenKrupp Elevator Company. We affirm the trial court's judgment.

## Background

Greatland owns the Sterling Center, a commercial building managed by CSL. Hurricane Ike caused damage to the Sterling Center, including its elevator. Greatland hired Emergency Services 24, Inc. to repair the building, and Emergency Services subcontracted the elevator work to ThyssenKrupp. The subcontract provided for upfront payment of 30% of the contract price ($31,393.50), with the remainder of the contract price (originally $96,558) to be paid later. Emergency Services paid ThyssenKrupp the $31,393.50 initial payment on a credit card in the name of Micah Bass, Emergency Services' owner. After receiving the initial payment, ThyssenKrupp started work on the elevator. Emergency Services subsequently had a dispute with Greatland and left the project in December 2008.

After Emergency Services left the project, CSL requested that ThyssenKrupp remain on the job. CSL and ThyssenKrupp executed a change order that adjusted ThyssenKrupp's compensation under the elevator subcontract from $96,558 to $92,269. At ThyssenKrupp's request, CSL also sent ThyssenKrupp a letter, signed by CSL's president, in which CSL "hereby assum[ed] all terms, conditions, and obligations of the elevator modernization contract previously held

2

by Emergency Services 24, Inc." In the letter, CSL stated, "ThyssenKrupp will retain the $31,393.50 as initial payment toward the contract price."

In January 2009, Bass and Emergency Services disputed the $31,393.50 credit card payment to ThyssenKrupp.

In March, CSL and ThyssenKrupp executed an assumption agreement, under which CSL assumed Emergency Services' rights and obligations under the subcontract. In the assumption agreement, CSL and ThyssenKrupp modified the subcontract's price provision to provide for compensation in the amount of $60,875.50 (the modified contract price of $92,269 less the initial payment of $31,293.50 from Emergency Services). The assumption agreement also contained an indemnity provision:

> **3.4    Indemnification**
>
> In addition to the indemnification provision of the Subcontract CSL further agrees to defend, indemnify and hold harmless ThyssenKrupp, its parents, subsidiaries, affiliates, employees, subcontractors, insurers, attorneys, and agents, from any and all claims, demands, suits, and/or proceedings brought or made by [Emergency Services], or any of their parents, subsidiaries, affiliates, employees, subcontractors, insurers, attorneys, and agents arising out of or related to this Assumption Agreement, the Subcontract, ThyssenKrupp Elevator's retention of the Initial Payment and ThyssenKrupp's performance pursuant to the Subcontract from February 20, 2009 forward, excluding any claim(s) by [Emergency Services] for improper Elevator Work provided by ThyssenKrupp pursuant to the Subcontract, prior to February 20, 2009. . . .

An early draft of the agreement included an "additional compensation" provision stating, "As consideration for entering into this Assumption Agreement and in the event that ThyssenKrupp is required to return the $31,293.50 to [Emergency Services], CSL shall compensate ThyssenKrupp for the full contract value: $92,269." This provision was rejected by CSL and not included in the final written agreement. The parties assert that they were not aware that Bass had disputed the $31,293.50 payment with his credit card company at the time they executed the assumption agreement.

In June, Bass's credit card company charged-back the $31,393.50 payment to ThyssenKrupp. ThyssenKrupp appealed the chargeback with the credit card company but lost due to a lack of documentation of the transaction.[1] After the chargeback became final, Greatland sued Bass and Emergency Services seeking to recover the $31,393.50 payment. In the lawsuit, Greatland alleged that Bass and Emergency Services "rushed to Houston" from Florida in the wake of Hurricane Ike and "targeted Hurricane Ike victims who were property owners," particularly "business owners in Houston's local Vietnamese community," by "promising to make emergency repairs at no cost" and by obtaining insurance proceeds for the repairs, which Bass and Emergency Services never intended to complete. With

---

[1] Both parties blame the other party for failing to adequately document Emergency Services' role in the project.

4

respect to the subject matter of this lawsuit, Greatland alleged that Bass and Emergency Services had obtained insurance proceeds from Greatland's insurer to cover the $31,393.50 payment to ThyssenKrupp and had retained the insurance proceeds despite having secured a chargeback of the payment. The court ultimately dismissed that suit by agreement of the parties to the suit.

In August, ThyssenKrupp demanded that CSL reimburse the $31,393.50 chargeback pursuant to the indemnity provision in the assumption agreement. CSL disputed any indemnity obligation and also did not pay ThyssenKrupp the $60,875.50 balance owed under the subcontract for ThyssenKrupp's elevator work. ThyssenKrupp initiated this suit in November 2009 to recover both indemnification for the $31,393.50 initial payment and payment of the $60,875.50 for the elevator work performed. CSL and Greatland filed counterclaims and "cross-claims" against ThyssenKrupp asserting that ThyssenKrupp had failed to deliver functioning elevators. According to ThyssenKrupp, the elevators were completed but not turned on due to CSL's nonpayment. A few months after ThyssenKrupp filed suit, CSL sent ThyssenKrupp a check for $60,875.50 but labeled the check, "Final payment in complete satisfaction of assumption of the subcontract agreement." ThyssenKrupp returned the check to CSL's attorneys.

Shortly before trial, the parties filed cross-motions for summary judgment.[2] The trial court granted summary judgment in favor of ThyssenKrupp on all of its claims, awarding ThyssenKrupp $92,269 on its claims against CSL, plus attorneys' fees and interest, and entering a take-nothing judgment on CSL's and Greatland's claims against ThyssenKrupp. This appeal followed.

**ThyssenKrupp's Claims**

CSL's and Greatland's first three issues challenge the trial court's judgment in favor of ThyssenKrupp on its claims against CSL. ThyssenKrupp sought and obtained summary judgment against CSL on its claims for breach of contract and suit on verified account, each of which sought recovery of damages in the amount of $92,269—the full contract price, including reimbursement for the initial payment. The trial court granted ThyssenKrupp's summary judgment motion and awarded ThyssenKrupp $92,269 in damages.

**A.    Standard of review**

The parties filed cross-motions for traditional summary judgment on ThyssenKrupp's claims against CSL. We review summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *City of Galveston v. Tex. Gen. Land Office*, 196 S.W.3d 218, 221 (Tex. App.—Houston

---

[2]    ThyssenKrupp moved for summary disposition of all claims, including CSL's and Greatland's claims against it. CSL and Greatland moved for traditional summary judgment on ThyssenKrupp's claim for contractual indemnity only.

6

[1st Dist.] 2006, pet. denied). When, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we review the summary judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000).

ThyssenKrupp was entitled to summary judgment on its claims against CSL if it conclusively established each element of its claims. *See* TEX. R. CIV. P. 166a(c); *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *City of Galveston*, 196 S.W.3d at 221. CSL was entitled to summary judgment on ThyssenKrupp's claims if it conclusively negated at least one essential element of the claims or conclusively established each element of an affirmative defense to the claims. *See* TEX. R. CIV. P. 166a(c); *Frost Nat'l Bank*, 315 S.W.3d at 508–09. Because the summary judgment does not specify the grounds on which it was granted, CSL and Greatland must demonstrate that none of the proposed grounds is sufficient to support the judgment. *See Rogers v. Ricane Enters.,* 772 S.W.2d 76, 79 (Tex. 1989); *Tilotta v. Goodall,* 752 S.W.2d 160, 161 (Tex. App.—Houston [1st Dist.] 1988, writ denied); *West v. SMG*, 318 S.W.3d 430, 437 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Conversely, we will affirm the judgment if any one of the theories advanced in the motion is meritorious. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex. 2004); *West*, 318 S.W.3d at 437.

**B. ThyssenKrupp's indemnity claim**

In their first issue, CSL and Greatland challenge the trial court's traditional summary judgment in favor of ThyssenKrupp on its contractual indemnity claim for the $31,393.50 initial payment.

**1. The parties' arguments**

CSL and Greatland contend that CSL's indemnity obligation applies only to claims "brought or made . . . from February 20, 2009 forward," and therefore does not apply to the $31,393.50 chargeback, which CSL asserts was first initiated with the credit card company in January 2009. Alternatively, CSL and Greatland contend that the $31,393.50 charge dispute falls within the indemnity clause's exclusion of claims by Emergency Services "for improper Elevator Work provided by ThyssenKrupp" before February 20, 2009. CSL and Greatland further argue that the indemnity provision should be construed against ThyssenKrupp, as the drafter, and should not be construed as applying to the initial payment because CSL rejected the "additional compensation" draft provision that required CSL to compensate ThyssenKrupp for the full contract price in the event that ThyssenKrupp was required to return the initial payment. Finally, CSL contends that it is ThyssenKrupp's fault that Bass's credit card company approved the chargeback, and therefore ThyssenKrupp seeks indemnification for its own negligence and is subject to the express negligence doctrine.

8

ThyssenKrupp responds that the indemnity provision expressly contemplates indemnification relating to "ThyssenKrupp Elevator's retention of the Initial Payment" from Emergency Services; that it agreed to deletion of the "additional compensation" provision only because the assumption agreement contained the indemnity provision; that January 2009 is not the relevant date for the chargeback, which the parties were not aware of until April 2009 and which did not actually occur until June 2009; and that the chargeback did not arise out of "improper Elevator Work" but rather out of Greatland's removal of Emergency Services as general contractor on the project. ThyssenKrupp also disputes that it was the drafter of the assumption agreement, asserting that the parties worked together to reach a mutually agreeable contract, and that it was at fault for the chargeback.

### 2. The summary judgment evidence of Bass's claim

CSL identifies January 30, 2009 as the relevant date based on a letter to Bass from his credit card company that Bass filled out and returned. The letter from the credit card company, dated January 29, 2009, states that it relates to Bass's "inquiry about the transaction dated 11/11/2008 in the amount of $31,393.50." The letter requests that Bass provide the credit card company with specific information about when "the order was (CIRCLE ONE) cancelled/ returned," why the "order was cancelled," and "the merchant's response when you attempted to resolve your dispute." The letter also states that a "conditional credit has been issued in your

9

account while we investigate this matter on your behalf." Handwritten on the letter is Bass's response: he circled that the "order" was "returned" and provided the return date as December 1, 2008. In the blank next to the sentence beginning, "This order was cancelled because," he wrote, "cancelled not my contract." In response to the request for details about "the merchant's response when you attempted to resolve your dispute," he wrote, "The owner of elevator is to pay for this." Bass signed the letter and dated his signature January 30, 2009. The evidence does not conclusively establish when the credit card company received Bass's response, but the letter bears a "received" stamp dated February 12, 2009.

The record also contains a letter from Bass to his credit card company dated March 3, 2009, with the subject line "re: Unauthorized charge on Personal Account for Micah D. Bass." In this letter, Bass asserted that ThyssenKrupp's contract was with Emergency Services, not Bass personally, and ThyssenKrupp did not have authority to charge the initial payment to his personal credit card.

Bass's credit card company executed an "Expedited Billing Dispute Resolution Process Form" on April 15, 2009. ThyssenKrupp and CSL each assert that this is the date on which they became aware of the chargeback procedure. Bass's credit card company charged-back the initial payment on June 23, 2009, and sent ThyssenKrupp notice of the chargeback on the same date.

### 3. Rules of construction

We construe indemnity provisions pursuant to the ordinary principles of contract interpretation. *See Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). Our primary purpose is to give effect to ThyssenKrupp's and CSL's intent, as expressed in their agreement. *See id.*; *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008). We construe the assumption agreement in light of the facts and circumstances surrounding its execution, but we may not consider parol evidence to vary the terms of the agreement or to create ambiguity where the language of the agreement is clear and unambiguous. *See Houston Exploration*, 352 S.W.3d at 469; *Don's Bldg. Supply*, 267 S.W.3d at 23; *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008). If the contract uses unambiguous language, we enforce it as written. *See David J. Sacks*, 266 S.W.3d at 450–51; *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006). This is because the parties' intent is "governed by what they said in the agreement, not by what one side or the other alleges they intended to say but did not." *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010).

## 4.     Construction of the indemnity provision

Under the assumption agreement's indemnity provision, CSL agreed to indemnify ThyssenKrupp "from any and all claims, demands, suits, and/or proceedings . . . brought or made by" Emergency Services and its agents "arising out of or related to . . . ThyssenKrupp Elevator's retention of the Initial Payment . . . from February 20, 2009 forward." The central issue here is whether the chargeback of the initial payment was brought or made "from February 20, 2009 forward." The February 20 date used in the indemnity provision is also used throughout the assumption agreement, demonstrating the parties' intent that CSL would effectively step into Emergency Services' shoes with respect to the elevator subcontract, but only from February 20 forward. For example, CSL "accept[ed] and assume[d] the terms and conditions of the Subcontract from [Emergency Services] and assume[d] all of the rights, benefits and obligations of [Emergency Services], from February 20, 2009 forward and covenant[ed] and agree[d] to observe and perform all of the duties and obligations including but not limited to the payment directly to ThyssenKrupp for Elevator Work pursuant to the Subcontract." The parties do not specify in their briefing why they chose February 20 as the pivotal date. The evidence indicates that the assumption agreement, which was ultimately executed in March, initially bore a February execution date.

Unlike the remainder of the contract, under which CSL's obligations to ThyssenKrupp generally arose on February 20 and continue forward in time, CSL's obligations under the indemnity provision may extend to events and occurrences before February 20. So long as a "claim[], demand[], suit[], and/or proceeding[]"is brought on or after February 20, and the subject matter is within the scope of the indemnity provision, it does not matter when the events giving rise to the claim, demand, suit, or proceeding occurred; the exception to this is the exclusion for "improper" elevator work, discussed below.[3] Relatedly, while the remainder of the contract focuses on CSL's assumption of pre-existing right and obligations previously afforded to Emergency Services, the indemnity provision

---

[3] The terms "claim," "demand," and "proceeding" are not defined in the assumption agreement. We therefore give those terms their ordinary meaning, and may look to dictionaries for commonly accepted usages. *See, e.g.*, *Gilbert Tex. Const.*, 327 S.W.3d at 127; *E.I. Du Pont De Nemours & Co. v. Shell Oil Co.*, 259 S.W.3d 800, 806 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). Black's Law Dictionary's definitions of "claim" include: "[t]he aggregate of operative facts giving rise to a right enforceable by a court," "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional," "[a] demand for money or property to which one asserts a right," "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing," and "[a] right to payment or to an equitable remedy for breach of performance if the breach gives rise to a right to payment." BLACK'S LAW DICTIONARY 240–41 (7th ed. 1999). It defines a "demand" as "[t]he assertion of a legal right" and "[a] request for payment of a debt or an amount due." *Id.* at 441. Finally, it defines a "proceeding" as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment," "[a]ny procedural means for seeking redress from a tribunal or agency," "[a]n act or step that is part of a larger action," and "[t]he business conducted by a court or other official body; a hearing."

imposes a new duty on CSL, not defined by Emergency Services' rights or obligations under the subcontract.

A primary purpose of the assumption agreement, as evidenced on the face of the agreement, is to protect ThyssenKrupp from the risks associated with Greatland's removal of Emergency Services as the general contractor for the project after the project commenced, especially with respect to payment of the contract price. References to this can be found throughout the agreement: "CSL hereby . . . covenants and agrees to observe and perform all of the duties and obligations including but not limited to the payment directly to ThyssenKrupp for Elevator Work pursuant to the Subcontract"; "CSL further acknowledges and agrees with ThyssenKrupp that, subject to the applicable provision(s) of the Subcontract, CSL is responsible for the payment of any and all compensation to ThyssenKrupp for services and/or materials provided or to be provided by ThyssenKrupp per the subcontract." And the indemnity provision evidences a specific intent to protect ThyssenKrupp with respect to the risk that Emergency Services would seek to rescind the initial payment as a result of Emergency Services' removal from the project by requiring CSL to indemnify ThyssenKrupp "from any and all claims, demands, suits, and/or proceedings brought or made by" Emergency Services or its agents "arising out of or relating to . . . ThyssenKrupp Elevator's retention of the Initial Payment[.]"

14

Additionally, the contract documents demonstrate the parties' intent that ThyssenKrupp would receive the full contract price—$92,269—for its elevator work, as modified by the first change order. The change order executed between Emergency Services and CSL after Emergency Services left the project reflects a contract price of $92,269. The assumption agreement recites that CSL requested that ThyssenKrupp "retain" the $31,393.50 initial payment made by Emergency Services and that CSL "owe[d] ThyssenKrupp the balance remaining under the Subcontract . . . $60,875.50." CSL admits that it submitted the ThyssenKrupp subcontract to its insurer, and its insurer issued payment "for that full price, the [$]92,000."

In light of these provisions, the contract unambiguously establishes the parties' intent that CSL would indemnify ThyssenKrupp from Emergency Services' revocation of the initial payment. CSL's alternative interpretation of the provision would allow CSL to avoid one of its principle obligations to ThyssenKrupp under the contract by relating the chargeback back to the date on which Bass filled out one of his credit card company's charge dispute forms. Nothing in the contract supports a contention that the parties intended the February 20 date in the indemnity provision to relieve CSL of its indemnity obligation in the event that, purportedly unbeknownst to the parties, Emergency Services or Bass

15

had contacted his credit card company about the charge before February 20 and the execution of the agreement.

Instead, we read the February 20 date as excluding any disputes that had developed into a claim, demand, proceeding or lawsuit between Emergency Services and ThyssenKrupp before that date. This is consistent with the indemnity provision's exclusion, which carves out pre-February 20 disputes between Emergency Services and ThyssenKrupp relating to ThyssenKrupp's elevator work under the subcontract. CSL is obligated under the assumption agreement to indemnify ThyssenKrupp for claims, demands, proceedings, and suits relating to the initial payment "from February 20, 2009 forward," and that obligation was in effect in April 2009 when the Bass's credit card company initiated its expedited billing dispute resolution process and in June 2009 when the credit card company demanded chargeback of the initial payment. Because the assumption agreement is unambiguous as to the parties' intent with respect to ThyssenKrupp's retention of the initial payment, we need not consider extrinsic evidence. *See Houston Exploration*, 352 S.W.3d at 469–70 (stating that contract negotiations "may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole").

We reject CSL's contention that the chargeback falls within the indemnity provision's exclusion for "improper Elevator Work." There is no evidence in the

record that the chargeback related to the nature or quality of ThyssenKrupp's elevator work. To the contrary, the evidence establishes that the chargeback is the result of Bass's representations to his credit card company that he did not receive the merchandise for which he paid. The chargeback notice repeatedly represents that the reason for the charge back was "Non-Receipt of Merchandise" and that "[t]he chargeback occurred because your customer claims they have paid for items that were to be delivered from your establishment but have not yet been received." Although CSL and Greatland assert that this is evidence that ThyssenKrupp "failed to install an elevator at the Sterling Center," it is clear that the customer referenced by the credit card company is Bass, not CSL or Greatland.

We likewise reject CSL's reliance on the express negligence doctrine. Because indemnification of a party for its own negligence is an extraordinary shifting of risk, indemnity provisions that require one party to indemnify another for losses caused by the other party's own negligence are subject to special notice requirements. *See, e.g.*, *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). One such notice requirement is the express negligence doctrine. *Id.* This doctrine states that "a party seeking indemnity from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract." *Id.*; *see Audubon Indem. Co. v. Custom Site-Prep, Inc.*, 358 S.W.3d 309, 319 (Tex. App.—Houston [1st Dist.]

17

2011, pet. denied) ("The express negligence doctrine dictates that a party's intent to be released or indemnified from its own future negligence must be clear and unambiguous.").

The express negligence doctrine applies when the claim for which indemnity is owed is based on the negligence of the party seeking indemnity; it does not apply to CSL's obligation to indemnify ThyssenKrupp from the chargeback when Bass did not assert that ThyssenKrupp was negligent in obtaining the chargeback and the credit card company did not rely on any allegation of negligence by ThyssenKrupp in processing the chargeback. *See, e.g.*, *Dresser Indus.*, 853 S.W.2d at 508; *Audubon Indem.*, 358 S.W.3d at 319. The only allegation of negligence on the part of ThyssenKrupp is CSL's allegation that ThyssenKrupp was negligent in failing to better document the initial payment charge and would have prevailed in the chargeback appeal if it had provided better documentation. CSL has not identified any Texas case extending the express negligence doctrine to such circumstances, and we decline to do so here. *Cf. Audubon Indem.*, 358 S.W.3d at 319 (declining to apply express negligence doctrine when claim against indemnitee was not based on indemnitee's negligence).

We overrule CSL's and Greatland's first issue.

## C.    ThyssenKrupp's breach of contract claim

In their second issue, CSL and Greatland challenge the trial court's summary judgment in favor of ThyssenKrupp on its breach of contract claim, arguing that "ThyssenKrupp refused to fulfill its contractual obligations even though CSL had offered and had tendered payment of the full amount required under the Assumption Agreement for the turnover of a working elevator." Because we have held that CSL was obligated to indemnify ThyssenKrupp for the chargeback of the initial payment, CSL's "tendered payment" necessarily was not fulfillment of CSL's contractual obligations to ThyssenKrupp. *See Baucum v. Great Am. Ins. Co. of N.Y.*, 370 S.W.2d 863, 866 (Tex. 1963) ("A tender is an unconditional offer by a debtor or obligor to pay another . . . a sum not less in amount than that due . . . ."). Moreover, the evidence in the record shows an offer of payment only after this lawsuit was filed and expressly conditioned the payment on acceptance in "complete satisfaction" of the parties' dispute.[4] *See C. R. Bean Corp. v. Rodriguez,*

---

[4]    In their reply brief, CSL and Greatland contend that there is evidence in the record that they made an offer of payment before the settlement offer made in the course of this lawsuit, but the evidence they cite in support of this contention does not establish any pre-lawsuit offers of settlement. First, they cite to affidavit testimony that does not provide any dates or otherwise establish the timing of payment offers, and that is not inconsistent with the evidence that CSL and Greatland offered a check to ThyssenKrupp only once, after the lawsuit was filed and in complete satisfaction of all claims. Second, they cite to deposition testimony from Isabell Howard who, when asked whether Ms. Le (of CSL) "[]ever told you that they were refusing to pay the payment," responded, "She didn't say 'refused.' She wasn't going to pay this until there was resolution on the – that initial 31,000 and change." This testimony supports ThyssenKrupp's contention that CSL refused to

19

583 S.W.2d 900, 901 (Tex. App.—Corpus Christi 1979, no writ) ("A tender, to be effective, must be legally valid; it must be unconditional; it is without legal effect if it is accompanied by conditions which the debtor has no right to impose.") (citing *Baucum*, 370 S.W.2d 863; *Plasky v. Gulf Ins. Co.*, 335 S.W.2d 581 (Tex. 1960)). Thus, we reject CSL's contention that its post-lawsuit, conditional offer of $60,875.50 fulfilled its contractual obligations to ThyssenKrupp or constituted a valid tender of payment that imposed on ThyssenKrupp a duty to turn over the elevator.

In their reply brief, CSL and Greatland contend that there is no evidence that ThyssenKrupp ever completed the elevator work or arranged for a final inspection. But the record does contain evidence that the elevator work was completed—it contains deposition testimony, affidavit testimony, invoices, and records showing the elevator parts and services rendered by ThyssenKrupp and the amounts due in payment for these parts and services under the contract. The record also establishes that the parties never arranged for the final turnover meeting—at which the inspection would be performed, payment of any outstanding amounts due under the contract would be made, and the elevator would be turned on—and that CSL refused to make payment. This is not limited to CSL's refusal to indemnify

make any payment unless ThyssenKrupp dropped its demand for indemnity of the $31,393.50 initial payment.

20

ThyssenKrupp for the $31,393.50 initial payment—CSL had not paid any of ThyssenKrupp's invoices and made no payment or offer of payment until after this lawsuit was filed.

Although there is also evidence in the record that ThyssenKrupp was not willing to turn over the elevator until CSL paid the full contract price, including the initial payment, we have held that ThyssenKrupp was entitled to recover this amount from CSL under the contracts. Additionally, the subcontract does not place the burden of arranging for turnover of the elevator on ThyssenKrupp, as opposed to CSL. The only specific duty imposed by the contract with respect to arrangements for turning over the elevator are imposed on CSL: "Upon notice from [ThyssenKrupp] that the installation of the elevator has been completed, [CSL] will arrange to have present at the installation site a person duly authorized to make the final inspection and to provide a written acceptance." Moreover, as CSL and Greatland point out in their briefing, CSL and Greatland demanded that ThyssenKrupp remove the elevator from the premises.

We overrule CSL's and Greatland's second issue.

## D.  ThyssenKrupp's suit on sworn account

In their third issue, CSL and Greatland challenge the trial court's summary judgment in favor of ThyssenKrupp on its suit on sworn account. Because we have affirmed the trial court's summary judgment on the basis of ThyssenKrupp's

21

breach of contract suit, we need not determine whether the summary judgment could also be affirmed on the basis of ThyssenKrupp's suit on sworn account.

We overrule CSL's and Greatland's third issue.

**CSL's and Greatland's Claims against ThyssenKrupp**

In their live pleadings, CSL asserted counterclaims against ThyssenKrupp for "breach of contract, fraud, fraud in the inducement, violations of the Texas Deceptive Trade Practices – Consumer Protection Act, breach of express and implied warranties of merchantability, of fitness for a particular purpose, of good and workmanlike services, and unreasonable collection efforts," and Greatland asserted "cross-claims" against ThyssenKrupp for "violations of the Texas Deceptive Trade Practices – Consumer Protection Act, breach of express and implied warranties of merchantability, of fitness for a particular purpose, of good and workmanlike services, and unreasonable collection efforts." They also asserted defenses based on, among other things, fraud and estoppel theories. ThyssenKrupp moved for no-evidence summary judgment on each of CSL's and Greatland's claims and affirmative defenses.

**A.     Standard of review**

ThyssenKrupp was entitled to a no-evidence summary judgment on each of CSL's and Greatland's claims and affirmative defenses as to which (1) ThyssenKrupp asserted in its motion that there was no evidence of one or more

specified elements and (2) CSL and Greatland produced no summary judgment evidence raising a genuine issue of material fact on those elements. *See* TEX. R. CIV. P. 166a(i); *Frost Nat'l Bank*, 315 S.W.3d at 508–09; *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006); *City of Galveston*, 196 S.W.3d at 221; *Wilson v. Shanti*, 333 S.W.3d 909, 916 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). To avoid summary judgment, CSL and Greatland were required to file a timely response identifying evidence in the record sufficient to raise an issue of fact on each challenged element of their claims and affirmative defenses. *See* TEX. R. CIV. P. 166a(i); *Imkie v. Methodist Hosp.*, 326 S.W.3d 339, 343 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("If a nonmovant wishes to assert that, based on the evidence in the record, a fact issues exists to defeat a no-evidence motion for summary judgment, the nonmovant must timely file a response to the motion raising this issue before the trial court.").

**B.    Fraud claims and defenses**

In their fourth issue, CSL and Greatland argue,

> The trial court erred in granting no-evidence summary judgment for ThyssenKrupp on CSL's and Greatland's affirmative claims and defenses of fraud, fraud in the inducement, promissory estoppel, and equitable estoppel. ThyssenKrupp moved for no-evidence [summary judgment] on these claims contending that (1) there was no evidence of a misrepresentation or promise; and (2) there was no evidence of any reliance on the misrepresentation or promise. The summary judgment record[] presents evidence as to each of these challenged elements. ThyssenKrupp represented and promised that it would deliver a functional elevator upon payment of $60,875.50[].

23

ThyssenKrupp further represented that CSL would only be responsible for payment of $60,875.50[]. ThyssenKrupp never disclosed that it would take steps to hold CSL hostage with an inoperable elevator in the event [Emergency Services'] credit card payment was returned. CSL and Greatland relied on these representations and nondisclosures in the execution of the Assumption Agreement. ThyssenKrupp's representations were however false. Accordingly, ThyssenKrupp's motion for no-evidence summary judgment should have been denied.

(record citations omitted). CSL and Greatland made the same argument in their response to ThyssenKrupp's motion for summary judgment.

CSL and Greatland do not accurately portray ThyssenKrupp's grounds for summary judgment on their fraud-related claims. ThyssenKrupp specifically challenged CSL's and Greatland's evidence of each element of fraud, including the elements that ThyssenKrupp (1) made a false representation with knowledge that the representation was false or recklessly made a positive assertion without knowledge as to the truthfulness of the representation and (2) intended that CSL and Greatland rely on the representation. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (identifying elements of fraud). These elements are likewise necessary to a fraudulent inducement claim. *See Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Knowledge of falsity and intent are also necessary elements of

CSL's and Greatland's equitable estoppel defense.[5] *See Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991) (identifying elements of equitable estoppel), *overruled on other grounds by In re United Servs. Auto. Ass'n*, 307 S.W.3d 299 (Tex. 2010).

Because CSL and Greatland failed to identify, in their summary judgment response and on appeal, evidence raising an issue of fact on these necessary elements of their fraud claims and defenses, we must affirm the trial court's summary judgment. *See* TEX. R. CIV. P. 166a(i); *Imkie*, 326 S.W.3d at 343, 347. We overrule CSL's and Greatland's fourth issue.

## C. Breach of contract and prior breach

In their fifth issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on their breach of contract claim and prior-breach defense because the summary judgment evidence "conclusively establish[ed] that ThyssenKrupp was required to provide a working elevator upon

---

[5] CSL's and Greatland's promissory estoppel defense is not applicable to the claims at issue here. Promissory estoppel is an exception to the statute of frauds that allows the enforcement of an otherwise unenforceable promise. *See Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982) (holding that Texas Supreme Court had narrowed promissory estoppel doctrine "to cases where the promise was 'to sign a written agreement which itself complies with the Statute of Frauds.'") (quoting *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 934 (Tex. 1973); *Dodson v. Kung*, 717 S.W.2d 385, 389 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("Promissory estoppel operates only in those cases where the promise is to sign a written agreement which complies with the Statute of Frauds.").

payment of $60,875.50, the agreed-upon purchase price" and that "CSL repeatedly offered and did make payment of the purchase price." We have already held that ThyssenKrupp was also entitled to indemnity from CSL for the initial payment charged-back by Bass's credit card company and that CSL's offer of $60,875.50 in satisfaction of all of ThyssenKrupp's claims after ThyssenKrupp filed this lawsuit was not a full and proper tender under the assumption agreement. These holdings defeat CSL's and Greatland's argument on their breach of contract claim and prior-breach defense.

We overrule CSL's and Greatland's fifth issue.

## D.     Express negligence rule

In their sixth issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on the express negligence rule because it is not an affirmative defense but, rather, a rule of contract construction. We have already addressed the applicability of express negligence rule to this case.

We overrule CSL's and Greatland's sixth issue.

## E.     Comparative or proportionate responsibility

In their seventh issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on their defense of proportionate responsibility because the chargeback was based on ThyssenKrupp's negligence. ThyssenKrupp did not seek, and the trial court did not grant, a no-evidence

26

summary judgment on proportionate responsibility, which is not an independent cause of action but, rather, the law governing apportionment of liability in certain tort actions. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001–.003 (West 2008).

We overrule CSL's and Greatland's seventh issue.

## F. DTPA claims

In their eighth issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on their DTPA claims. CSL's and Greatland's DTPA claims are all founded on ThyssenKrupp's purported failure to deliver a functioning elevator to CSL upon payment of $60,875.50, pursuant to the assumption agreement. We have already held that CSL and Greatland were in breach of the assumption agreement because they failed to honor their indemnity obligations under the agreement and that CSL's offer to pay ThyssenKrupp $60,875.50 "in complete satisfaction of the assumption of the subcontract agreement" during the course of this litigation was not a proper tender of CSL's payment obligations under the agreement. The trial court therefore did not err in granting a no-evidence summary judgment on CSL's and Greatland's DTPA claims.

We overrule CSL's and Greatland's eighth issue.

## G.     Unreasonable collection efforts

In their ninth issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on their unreasonable collection efforts claims. CSL and Greatland assert that ThyssenKrupp "exceeded the bounds of reason or moderation" by "burden[ing] the Sterling Center with an inoperable elevator until [ThyssenKrupp] received payment of the chargeback." Specifically, CSL and Greatland assert that, in the event CSL failed to make payments due to ThyssenKrupp under the subcontract, ThyssenKrupp was contractually obligated to remove its elevator from the building. CSL and Greatland cite page ten of the elevator subcontract to support this contention. Page ten of the subcontract contains a "Title and ownership" clause. This clause provides that ThyssenKrupp retains title to all equipment supplied under the subcontractor until CSL fulfills all payment obligations, that "ThyssenKrupp may take immediate possession of the equipment and enter upon the premises where it is located (without legal process) and remove such equipment or portions thereof," and that the parties agree that the equipment "can be removed without material injury to the real property."

By providing that ThyssenKrupp retains ownership over its equipment and may remove the equipment in the event of non-payment, the contract authorized ThyssenKrupp to remove and retain the equipment but did not require ThyssenKrupp to do so. Given its plain and common meaning, the term "may" is

28

generally permissive rather than mandatory. *See Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex. App.—Austin 1996, writ denied) ("The word 'may' means possibility, permission, liberty, or power; it does not indicate a mandatory requirement.") (citing BLACK'S LAW DICTIONARY 979 (6th ed. 1990)); *see also McCarty v. Montgomery*, 290 S.W.3d 525, 534 (Tex. App.—Eastland 2009, pet. denied) (holding that contract providing, "Buyer may terminate this contract," "described [termination] permissively," and did not limit buyer's remedies to termination of contract). Construing the "Title and ownership" provision as giving ThyssenKrupp a right in the event of default by CSL, rather than imposing an additional obligation on ThyssenKrupp in the event of default by CSL, is consistent with the tenor of the provision and with the subcontract agreement as a whole. "We interpret a word in a contract according to its usual grammatical meaning unless it clearly appears that the parties intended otherwise." *Nalle*, 914 S.W.2d at 687 (holding that lease provision stating that lessee "may" use leased premises for particular purpose did not obligate lessee to use premises for that purpose).

Because the elevator subcontract did not require ThyssenKrupp to remove the elevator from Sterling Center upon CSL's failure to make payments, and because CSL identifies no other basis for imposing a duty on ThyssenKrupp to remove the elevator, ThyssenKrupp's failure to do so does not constitute an

unreasonable collection effort. *See Montgomery Ward & Co. v. Brewer*, 416 S.W.2d 837, 844 (Tex. Civ. App.—Waco 1967, writ ref'd n.r.e.) (describing conduct giving rise to common law tort for unreasonable collection efforts as "efforts that amount to a course of harassment that was willful, wanton, malicious, and intended to inflict mental anguish and bodily harm.").

We overrule CSL's and Greatland's ninth issue.

## H. Trespass

In their tenth issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on Greatland's claim for trespass. Like its unreasonable collection efforts claim, Greatland's claim for trespass is founded on ThyssenKrupp's failure to remove the elevator from Sterling Center after CSL failed to make payment. We have already held that ThyssenKrupp was not obligated to remove the elevator from Greatland's premises. The trial court therefore did not err in granting summary judgment on Greatland's trespass claim.

We overrule CSL's and Greatland's tenth issue.

## I. Damages

In their eleventh issue, CSL and Greatland contend that the trial court erred in granting a no-evidence summary judgment on the grounds that CSL and Greatland failed to present evidence of damages. Because we have affirmed the trial court's summary judgment on each of CSL's and Greatland's claims on other

30

grounds, we need not address whether summary judgment was also proper on the ground that there was no evidence of damages. *See Joe*, 145 S.W.3d at 157; *West*, 318 S.W.3d at 437.

We overrule CSL's and Greatland's eleventh issue.

## Conclusion

We hold that the trial court did not err in granting a traditional summary judgment in favor of ThyssenKrupp on its breach of contract claims against CSL. We further hold that the trial court did not err in granting a no-evidence summary judgment in favor of ThyssenKrupp on CSL's and Greatland's claims and affirmative defenses against it. Accordingly, we affirm the trial court's judgment. All outstanding motions are dismissed as moot.

Harvey Brown
Justice

Panel consists of Justices Keyes, Massengale, and Brown.